FILED
JAN 0 5 2011

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

JANICE DAVIS,                                                    Civ. No. 09-649-AC

                              Plaintiff,                          OPINION AND
                                                                      ORDER

        v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                              Defendant.

_____

ACOSTA, Magistrate Judge:

        Claimant Janice Davis ("Claimant") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her application for Supplemental

Security Income ("SSI") disability benefits under Title XVI of the SSA. *See* 42 U.S.C. §§ 1381-83f

(2010).  This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C.

OPINION AND ORDER                           1                                    {KPR}

§ 405(g). Following a careful review of the record, the court remands the decision of the Commissioner for reconsideration at Step Five of the sequential evaluation process.

*Procedural History*

Claimant filed for Disability Insurance Benefits and SSI benefits on June 22, 1999. The claim was denied initially and on reconsideration. Claimant appeared on March 13, 2001, the date the hearing was initially scheduled, and was granted a postponement so that she could obtain representation. On June 20, 2001, a hearing was held before an Administrative Law Judge ("ALJ"), who issued a decision on July 26, 2001, finding Claimant not disabled.

Claimant again filed for SSI benefits on July 24, 2003, alleging a disability onset date of February 1, 2001. (Tr. 52-53.) The claim was denied initially and on reconsideration. Claimant filed a request for hearing, and a hearing was held on January 22, 2007. A decision[1] issued on June 14, 2007, found Claimant disabled between March 1, 2004, and November 20, 2006. Claimant requested review by the Appeals Council. This request was denied, making the ALJ's decision the final decision of the Commissioner. A request for review was filed in this court on June 10, 2009.

*Factual Background*

Claimant was admitted to Salem Hospital on June 1, 1999, "on a voluntary basis for treatment of depression with possible psychotic features." (Tr. 163.) Dr. Scott Eastin, M.D. ("Dr. Eastin") summarized her condition: at that time, Claimant had suffered "episodic depression" for

---

[1] The administrative record contains a copy of the 2001 decision. It does not contain a copy of the 2007 decision which is the decision currently under review. Claimant submitted a copy of the 2007 decision as an exhibit to her opening brief. The Commissioner neither objects to its submission in this form nor disputes that it is the decision currently under review. Thus, the court accepts the submission. The court has assigned page numbers to the exhibit sequentially and it is hereinafter referred to as the Supplemental Transcript or "Supp. Tr."

five to six years; she was intermittently responsive to medication for depression, specifically Effexor and Serzone; Claimant reported regular use of the drugs "crank" and marijuana; she claimed her most recent use of crank was three weeks prior to hospital admission, but Dr. Eastin questioned her credibility on this point; she reported some suicidal thoughts, but no past suicide attempts. Claimant was released from Salem Hospital on July 24, 1999.

In a "Disability Report" completed on July 24, 2003, Claimant stated that she was unable to work because of hepatitis C, asthma, depression, and allergies. (Tr. 58.) In particular, she cited her difficulties with depression which would intensify when she began a job, resulting in absences and subsequent termination. Regarding activities of daily living, Claimant reported the following. Claimant is capable of personal care and grooming. She has lived with her mother since she lost her apartment due to domestic abuse and fighting with her "old man" and has since had a baby. (Tr. 78-9.)  Claimant and her mother perform the needed household chores, though Claimant reports difficulty cleaning when she is depressed. She handles the money in the household and shops, but only when she has to. (Tr. 80.) She does not read often, but watches a lot of television, listens to music, and takes care of her child. (Tr. 81.) Claimant also reports having headaches that are getting worse over time. (Tr. 82.)

On her pain questionnaire, Claimant reports having headaches every day and body pain some days. The pain limits her ability to lift, bend, stoop, do housework, and care for her child. (Tr. 85.) She sometimes takes aspirin and Tylenol for her pain, and takes Effexor daily for depression. (Tr. 85-6.) She has pursued counseling to treat her depression. (Tr. 86.)

Janice Holt ("Holt"), Claimant's mother, filled out a third-party Adult Function Report, dated September 23, 2003, on her daughter's behalf in which she stated that Claimant has been "disabled

from birth." (Tr. 89.) Holt also described Claimant's activities of daily living which included errands, housework, watching television, visiting, taking walks, caring for her daughter, and taking care of pets. (Tr. 88-9.) Although Claimant performs her own activities of self-care, her mother sometimes reminds her to bathe or take her medication. (Tr. 90.) According to Holt, Claimant goes out every day and shops in stores. (Tr. 91.) Holt stated that Claimant talks on the phone frequently and goes out approximately three to four times a week, but she also stated that Claimant keeps to herself a lot. (Tr. 92.) Holt described Claimant as having speech and learning difficulties, and suffering from mild depression in her youth. She described Claimant's current condition: "She has tried working but never keeps a job long. She becomes depressed, maybe from the stress of working. She has been in and out [of] group homes, mental hospitals, lived with friends and family, and in the streets." (Tr. 95.)

Holt filled out another third-party function report on September 22, 2005. Holt described Claimant as generally functional but requiring regular help and reminders from her mother. (Tr. 129.) She described Claimant as frequently tired, slow to complete tasks, unmotivated, and easily distracted. Holt wrote that Claimant's most recent suicide attempt was due, in part, to being overwhelmed by caring for her child and attending the job search classes required to receive benefits. Claimant was scheduled for major facial reconstructive surgery, after which she would require a lot of assistance from her family. According to Holt: "Her ability to make decisions has been affected. Her thinking, caring for self and daughter is limited. She's not able to work or live on her own. She knows she will always need my help." (Tr. 136.)

Claimant reports that she has been depressed for many years and attempted suicide many times. Most recently, Claimant jumped from an overpass and sustained serious injuries which

included broken facial bones, wrist, and knee cap. (Tr. 125.) These injuries have resulted in a lot of pain which itself is upsetting to Claimant. (Tr. 125.) On a pain questionnaire, Claimant reports constant pain, especially when it is cold. She reported taking Effexor, Trazodone, Lithium, and Clonazepam on a daily basis. (Tr. 127.)

Claimant underwent a neuropsychological screening on November 9, 2005, conducted by Dr. Leslie Pitchford, Ph.D ("Dr. Pitchford"). Dr. Pitchford referred to Claimant's 2004 suicide attempt which resulted in a traumatic brain injury and fractures to her face and ribs. During the screening, Claimant described a pattern of losing jobs because of depression. Dr. Pitchford noted the results of psychological testing which revealed that Claimant has a Full Scale I.Q. of 69 which is characterized as "extremely low." (Tr. 392.) Claimant was diagnosed with a nonspecific cognitive disorder, borderline intellectual functioning, and a GAF score of 30, which indicates either delusional or hallucinatory behavior or an inability to function in almost all areas. (Tr. 391.)

Dr. Peter LeBray, Ph.D. ("Dr. LeBray"), filled out a Mental Residual Functional Capacity Assessment on December 12, 2005. He characterized Claimant as moderately limited in ten out of twenty categories and wrote that Claimant "shows the inability to maintain concentration or persist at a level commensurate with competitive job settings." (Tr. 405.) As for social interaction, he wrote that Claimant "can get along on a casual, routine basis . . . but would need patient, supportive, extraordinary supervision." *Id.* He also agreed with the doctors who assessed Claimant's GAF score as 30 and 35. Dr. LeBray also filled out a Psychiatric Review Technique wherein he diagnosed Claimant with the following impairments: a nonspecific cognitive disorder; borderline intellectual functioning; depression; borderline personality disorder; and substance abuse (in remission). (Tr. 408-416.) Dr. LeBray concluded that Claimant's impairments give rise to the following functional

limitations: moderate restriction in activities of daily living; moderate difficulties in maintaining social functioning; marked difficulty in maintaining concentration, persistence, or pace; and insufficient episodes of decompensation of extended duration to meet the functional criteria. (Tr. 417.)

In early 2007, Ronald Gorman completed a Medical Source Statement about Claimant. On January 18, 2007, Claimant demonstrated particularly severe impairments and was assessed as "Extremely Limited" with regard to understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; carrying out a normal workday and workweek without interruptions; interacting appropriately with supervisors; maintaining appropriate social behavior and observing social norms regarding neatness and cleanliness; responding appropriately to changes in the work setting; and traveling to unfamiliar places or using public transportation. (Tr. 422.) On February 1, 2007, Claimant's impairments were deemed somewhat less severe, though she was characterized as markedly limited in fourteen of twenty categories.

Between November 2005 and Januray 2007, Claimant was evaluated repeatedly by V. Balasubramanian, M.D. ("Dr. Balasubramanian"). Claimant presented on November 25, 2005, after having missed an appointment, and reported not having taken her medications in three weeks. The diagnostic section indicates that Claimant suffered from recurrent major depression with bipolar features and polysubstance abuse. Dr. Balasubramanian characterized Claimant as "unable to work" and assigned her a GAF score of 35. (Tr. 431.) On February 3, 2006, Claimant had recently had reconstructive surgery on her face. She admitted that she had recently craved street drugs, but was able to resist the urge with the help of her mother. An appointment on March 8, 2006, yielded

essentially the same report.  On May 11, 2006, Dr. Balasubramanian noted that Claimant had not followed up on lab reports showing a low thyroid level.  Claimant was "given [a] note that she is not employable at this time for another year."  (Tr. 428.)  On September 18, 2006, Dr. Balasubramanian wrote that Claimant made "no complaints of depression" though the assessment was otherwise the same.  (Tr. 427.)  On November 29, 2006, Claimant reported that she was getting along with her mother and was not otherwise complaining of depression.  The report tended to show general improvement, though she was still diagnosed as "unable to work" and having a GAF score of 35. (Tr. 426.) On January 19, 2007, Claimant again had failed to get lab work done as instructed, though the report was otherwise the same.

Claimant testified at the administrative hearing on January 22, 2007.  Claimant testified that she cooks simple meals approximately once a day and goes grocery shopping with her mother approximately once or twice a month.  (Tr. 468-69.)  She performs minimal house and yard work. Claimant stated that her primary activities are playing with her daughter, watching television, and listening to music.  (Tr. 472.)  She socializes only infrequently.  Claimant takes a variety of medications including Effexor, Clonazepam, Trazodone, and Lithium.  (Tr. 475-76.)  Claimant appeared confused about the last time she had used drugs and was unable, initially, to say if it had been one or two years, though she ultimately concluded that it had been approximately two years.

Claimant testified that she attempted suicide in 2004, which was triggered by depression and guilt over recent methamphetamine use.  (Tr. 481-82.)  Due to injuries sustained during the suicide attempt, Claimant experiences severe pain in her face and the pain is sometimes constant.  (Tr. 486.) She also reported daily headaches and pain in one of her wrists.  (Tr. 490-91.)  Following the suicide attempt, Claimant was in the "psych ward" for at least a couple of weeks.  After release, she was to

continue her mental health treatment at Bridgeway, but this was interrupted by Claimant's several surgeries. (Tr. 495-96.)

When asked about depression, Claimant responded that she was doing pretty well, though she experienced a lot of stress and anxiety. (Tr. 499.) She stated that she had difficulty remembering things, was distracted by caring for her daughter, and would occasionally get angry, but mostly at herself. (Tr. 499-501.) According to Claimant, her mother assists her in several ways, though Claimant no longer requires as much assistance. (Tr. 502.)

### Summary of the ALJ's Findings

The ALJ engaged in the five-step "sequential evaluation" process when he evaluated Claimant's disability, as required. *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Notably, the ALJ made separate findings for the period between March 1, 2004, and November 20, 2006 ("period of disability"), and the period after November 20, 2006. Those periods will be distinguished below, but only as necessary.

I.    Steps One and Two

At Step One, the ALJ concluded that Claimant had not engaged in any substantial gainful activity since the onset of her alleged disability. (Supp. Tr. 4.) At Step Two, the ALJ determined that Claimant suffered from severe impairments of depression and bi-polar disorder. (Supp. Tr. 9.)

A.    *Period of disability*

The ALJ concluded that during the period of disability, Claimant was disabled by depression and bipolar disorder. The ALJ noted that, while Claimant had a history of depression, it worsened in March 2004, culminating in a suicide attempt in which she jumped from a freeway overpass and sustained severe injuries. (Supp. Tr. 5.) The ALJ noted that Claimant's "musculoskeletal injuries

OPINION AND ORDER                    8                    {KPR}

subsequently improved and resolved by October 2005." (Supp. Tr. 5.)

The ALJ described how, throughout 2004 and 2005, Claimant's mental health records indicate that she continued to suffer from severe impairments, citing specifically Claimant's presentation at a neuropsychological exam and an I.Q. test wherein Claimant scored a total I.Q. of 70. The ALJ noted that the I.Q. score was attributed to the 2004 accident and was not considered "indicative of her lifelong ability[.]" (Supp. Tr. 5.) The record shows that Claimant continued to "report persistent symptoms related to depression such as anxiety, poor memory, and feelings of distress[,]" well into 2006. (Supp. Tr. 5.)

B.    *Period after November 20, 2006*

Beginning in November 2006, the ALJ concluded that the record showed improvement in Claimant's mental status and functional ability. Specifically, the ALJ cited treatment notes wherein Claimant "reported that she was doing well and did not experience any symptoms related to depression[,]" and that she was getting along better with others. (Supp. Tr. 5.) The ALJ discounted the GAF score of 35 as both contradictory to Claimant's representations and unsupported by objective findings from a recent mental status examination. Accordingly, the ALJ gave greater weight to Claimant's self-report. (Supp. Tr. 6.)

The ALJ states that treatment notes from 2007 "do not contain any significant objective findings, or the results of accepted psychological testing, which suggest any related significant limitation[.]" (Supp. Tr. 6.) The ALJ discounted a submission from Claimant's therapist that Claimant was markedly limited with respect to social functioning as inconsistent with the therapists' own treatment notes and the objective evidence in the record. The ALJ also concluded that the record evidence suggested that Claimant may have been engaging in substance abuse in 2007, which

OPINION AND ORDER                    9                              {KPR}

might also explain Claimant's limitations.

The ALJ concluded that, between the period of disability and the period after November 20, 2006, the impact of Claimant's impairment on activities of daily living went from moderate to mild. Similarly, the difficulty with which Claimant appropriately responds to and interacts with others went from moderate to mild. Claimant's deficiencies in concentration, persistence, and pace remain at a moderate level. The ALJ noted approximately two episodes of decompensation prior to November 20, 2006, but no such episodes after that date.

II.    Step Three

At Step Three, the ALJ determined that Claimant's impairments do not meet or medically equal a listing as set forth in the regulations. (Supp. Tr. 5.)

III.    Claimant's RFC

The ALJ determined that, in the period of disability, Claimant "was limited to simple, repetitive tasks that do not involve more than minimal interaction with others. [Claimant could not] adapt to routine changes and stresses, or maintain a schedule in the work place." (Supp. Tr. 7.) After November 20, 2006, the ALJ concluded that Claimant had the RFC to perform "simple, unskilled work." *Id.*

IV.    Step Four

At Step Four, the ALJ concluded that Claimant could not perform past relevant work. (Supp. Tr. 8.)

V.    Step Five

The ALJ concluded that, based on the record evidence and Claimant's testimony, Claimant showed "medical improvement related to her ability to work," and that applicable regulations thus

OPINION AND ORDER                            10                            {KPR}

directed a finding that Claimant is not disabled. (Supp. Tr. 8.)

*Discussion*

Claimant objects to the ALJ's conclusions on the following grounds: (1) the ALJ improperly relied on the grids; (2) the ALJ did not use a vocational expert or pose vocational hypotheticals; (3) the ALJ rejected the opinions of LeBray, Pitchford, and Gorman; (4) the ALJ formulated an incorrect RFC; and (5) the ALJ improperly rejected Claimant's testimony as not credible.

I.    The grids and the vocational expert

Claimant argues that, because she suffers from only non-exertional limitations, the ALJ improperly relied on the grids in determining that she was not disabled. The Ninth Circuit described the grids and their application in *Lounsbury v. Barnhart*, 468 F.3d 1111 (9th Cir. 2006). The grids are used at Step Five to determine, based on age, education, work experience, and physical ability, the "availability and numbers of suitable jobs" for a given claimant. *Id.* At 1114-15. The grids do not, however, take into account non-exertional limitations and "[t]hus . . . 'the grids should be applied only where a claimant's functional limitations fall into a standardized pattern accurately and completely described by the grids.'" *Id.* at 1115 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1103 (9th Cir. 1999)). Accordingly, "[w]here a claimant suffers only non-exertional limitations, the grids are inappropriate and the ALJ must rely on other evidence." *Id.* (citing *Cooper v. Sullivan*, 880 F.2d 1152, 1155 (9th Cir. 1989)).

The Commissioner argues that applying the grids was appropriate because Claimant's only non-exertional limitation was to simple, unskilled work which enables her to perform substantially all of the work listed in the Dictionary of Occupational Titles. Thus, the ALJ "limited the significance of [Claimant]'s non-exertional impairments," and application of the grids was

appropriate.   (Defendant's Brief 11.)   The Commissioner argues that the guidelines are only inapplicable to where the claimant's impairment is sufficiently severe.  *See Penny v. Sullivan*, 2 F.3d 953, 959 (9th Cir. 1993) ("A non-exertional impairment, if sufficiently severe, may limit the claimant's functional capacities in ways not contemplated by the guidelines. In such a case the guidelines would be inapplicable." (citing *Desrosiers v. Secretary of Health and Human Servs.*, 846 F.2d 573 (9th Cir. 1988)).

In *Derosiers*, the claimant alleged both exertional and non-exertional limitations.  The court noted that, though the presence of non-exertional limitations may make reliance on the grids inappropriate, a claimant may not avoid application of the grids simply by alleging a non-exertional limitation.  Rather, the court must "determine if a claimant's non-exertional limitations significantly limit the range of work permitted by his exertional limitations." 846 F.2d at 577 (citations omitted). Where a sufficiently severe non-exertional limitation "limit[ed] the claimant's functional capacity in ways not contemplated by the guidelines," the application of those guidelines "would be inappropriate."  *Id.*  The Ninth Circuit reached the same conclusion in *Penny v. Sullivan*, 2 F.3d 953 (9th Cir. 1993).   There, the claimant also suffered from both exertional and non-exertional impairments and, as above, the court noted that non-exertional limitations that are "sufficiently severe" render the guidelines inapplicable.  However, the court has been clear that, where a claimant is limited by only non-exertional limitations, the guidelines do not apply.  The Ninth Circuit wrote: "But where, as here, a claimant's nonexertional limitations are in themselves enough to limit his range of work, the grids do not apply, and the testimony of a vocational expert is required to identify specific jobs within the claimant's abilities."  *Polny v. Bowen*, 864 F.2d 661, 663-64 (9th Cir. 1988) (citing *Burkhart v. Bowen*, 856 F.2d 1335 (9th Cir. 1988)).

Here, the ALJ determined that Claimant suffered from depression and bipolar disorder, both of which are non-exertional impairments. Accordingly, the ALJ was not permitted to apply the grids to determine whether Claimant was disabled and, in doing so, the ALJ erred. It follows that the ALJ also erred in failing to consult a vocational expert.

II.    Rejection of LeBray, Pitchford, and Gorman

    *A.    LeBray and Pitchford*

Claimant argues that the ALJ erred when he ignored the opinions of Drs. LeBray and Pitchford. Dr. Pitchford evaluated Claimant on November 9, 2005, and acknowledged an I.Q. test placing Claimant in the category of "extremely low" and assigned Claimant a GAF score of 30. Dr. LeBray evaluated Claimant on December 12, 2005. He concluded that she lacked the concentration necessary to compete in the job market and, if employed, would require a high degree of supervision. Dr. LeBray also endorsed other physicians who gave Claimant a GAF score of 30 or 35. Claimant argues that the ALJ's analysis omits these significant limitations and, thus, is in error. Furthermore, Claimant asserts that Drs. LeBray and Pitchford identified additional impairments that the ALJ did not consider, including a personality disorder, borderline intellectual functioning, and status post-head injury. The Commissioner responds that the ALJ did account for these opinions in concluding that Claimant was disabled during the period of disability, between March 2004 and November 2006.

The opinions of Dr. LeBray and Dr. Pitchford were recorded in the midst of Claimant's period of disability. The ALJ concluded that Claimant's condition improved the year following these examination. Therefore, to the extent that the ALJ reasonably concluded that Claimant had improved, it was reasonable to discount these opinions for the post-disability period. Accordingly, the court agrees that the ALJ took proper notice of the findings of Dr. LeBray and Dr. Pitchford and,

thus, did not err.

       *B.*    *Gorman*

       The Code of Federal Regulations ("CFR") distinguishes between opinions from acceptable medical sources and those from other sources. According to the regulations, licensed physicians (medical or osteopathic doctors), licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists are acceptable medical sources. 20 CFR § 416.913(a). The ALJ is also permitted to consider the opinions of other sources, where other sources include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. 20 CFR § 416.1513(a). However, "[t]he ALJ is free to reject the testimony of an 'other source[]' by furnishing reasons germane to that particular witness." *Bowser v. Comm'r of Soc. Sec.*, No. 03-16066, 2005 U.S. App. LEXIS, at *17 (9th Cir. Feb. 7, 2005) (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)). As Claimant points out, Gorman qualifies as an other source for purposes of the regulations.

       Claimant argues that the ALJ erred with regard to Gorman's opinion in four respects: first, the ALJ summarily rejected Gorman's opinion simply because he was not a physician; second, the ALJ gave no weight to the fact that Gorman's opinion was consistent with the findings of Drs. LeBray and Pitchford; third, the ALJ rejected Gorman's treatment notes for a lack of objective findings, but did not request additional information; and, fourth, the ALJ ignored the comprehensive mental health exam Gorman prepared on December 5, 2006. These failures were compounded by the fact that Gorman was a treating practitioner and was thus in the best position to evaluate Claimant.

       The Commissioner responds that the ALJ gave germane reasons for rejecting Gorman's

OPINION AND ORDER           14           {KPR}

opinion, as required. Specifically, the ALJ discounted Gorman's treatment notes as lacking objective findings or test results that would support the marked limitations asserted by Claimant. The ALJ also observed that Claimant may have been using drugs and alcohol during 2007 and any evaluation of her would have been skewed by her condition whilst abusing substances. These reasons, the Commissioner maintains, were sufficient to meet the ALJ's burden when rejecting other source opinions.

The court agrees that the ALJ met his burden to give germane reasons for rejecting Gorman's conclusions. The ALJ explicitly discounted Gorman's notes for the reasons stated above. The ALJ generally rejected treatment notes from 2007 as likely influenced by Claimant's use of drugs and alcohol. These reasons are sufficient to reject the opinion of an "other source" provider and the ALJ has met this burden.

The Commissioner also defends the ALJ's rejection of certain findings of Dr. Balasubramanian as inconsistent with his treatment notes. Dr. Balasubramanian's treatment notes consistently indicate that Claimant is unable to work and has a GAF score of 35. However, the notes also reflect improvement in Claimant's condition over time. The ALJ gave greater weight to those notes that acknowledged the change in Claimant's condition and reflected her own statements and gave less weight to those findings that were static over time and did not reflect changes in Claimant's overall condition. The Commissioner argues that the court must uphold the ALJ's determination where it is a rational interpretation of the evidence, even if the court would have embraced a different, but also rational, interpretation. *See Kittelson v. Astrue*, 533 F. Supp. 2d 1100, 1107 (D. Or. 2007) ("The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision, but if the evidence supports more than one rational interpretation, the

OPINION AND ORDER                    15                    {KPR}

court must defer to and may not substitute its judgment for, that of the Commissioner.") (internal citations omitted).

The ALJ reviewed, at length, the treatment notes of Dr. Balasubramanian and described the manner in which he analyzed them. The ALJ explained the reasoning behind the decision to give greater weight to Claimant's statements than that given to Dr. Balasubramanian's other findings. Thus, the ALJ's conclusion that Claimant was improving over time with respect to both depression and her ability to get along with others was reasonable in light of the record evidence and the court will not disturb it.

III.   Residual Functional Capacity

Claimant argues that the ALJ's RFC is not supported by substantial record evidence. First, the ALJ failed to identify the objective basis for the proferred RFC. Second, the ALJ did not identify substantial evidence establishing that Claimant's impairments improved after November 20, 2006. Third, the ALJ incorrectly concluded that Claimant was getting along better with others when the notes only referred to her relationship with her mother, with whom she lives. The Commissioner responds that the ALJ properly considered the record evidence and formulated the RFC based on all of the limitations supported by the record evidence.

The ALJ set forth Claimant's RFC, as follows: "However, as of November 20, 2006, the date that the record reflects medical improvement in the claimant's ability to perform work activity, the record reveals that she retains the ability to perform simple, unskilled work." (Supp. Tr. 7.)

Prior to stating Claimant's RFC, the ALJ analyzed the functional limitations resulting from Claimant's mental impairments pursuant to the SSA's analytical framework. The ALJ noted that Claimant's degree of limitation went from moderate to mild with respect to the first and second "B

Criteria" and remained moderate with respect to the third. The ALJ addressed limitations related to psychological decompensation and the "C Criteria." As noted above, the ALJ concluded that Claimant had improved over time and, furthermore, that after November 20, 2006, the record lacked evidence to support Claimant's asserted level of limitation. Taken together, the ALJ adequately set forth the objective basis, underlying evidence, and analysis that informed Claimant's RFC and, accordingly, the ALJ did not err.

IV.    Claimant Credibility

Claimant argues that the ALJ erroneously rejected her testimony based on an improper credibility determination. Ninth Circuit precedent holds that

> [w]ithout affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of [her] pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive.

*Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999) (internal citations omitted). Claimant contends that the ALJ not only failed to give clear and convincing reasons, but failed to give any reasons at all. The Commissioner responds that the ALJ gave clear and convincing reasons, namely that Claimant's activities of daily living were inconsistent with her claimed level of impairment, as was the conservative course of treatment pursued by Claimant.

The ALJ found Claimant only partially credible for the following reasons: Claimant's activities of daily living were inconsistent with her stated degree of limitation; Claimant had not undergone psychological testing since November 2006 and lacks objective evidence of a serious mental impairment; Claimant's treatment record showed a general trend of improvement in Claimant's condition; and Claimant's conservative course of treatment undermined her claims of

OPINION AND ORDER                    17                    {KPR}

serious impairment.

The court agrees that the ALJ has given clear and convincing reasons to find Claimant only partially credible.

<em>Conclusion</em>

For the reasons stated, the decision of the Commissioner is REVERSED and REMANDED for proper analysis at Step Five, consistent with the court's opinion.

DATED this 5th day of January, 2011.

JOHN V. ACOSTA
United States Magistrate Judge